## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JOANN MITCHELL, as the administratrix of the Estate of DAVIEON WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH HEADLEY,<br>JEFFERSON DUNN,<br>GRANTT CULLIVER, and<br>WALTER POSEY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 2:18-cv-769-EC-WC<br><br>**JURY TRIAL DEMANDED** |

## <u>FIRST AMENDED AND RESTATED COMPLAINT</u>

Plaintiff Joann Mitchell, Administratrix of the Estate of Davieon Williams, deceased, ("Plaintiff") brings this civil rights action pursuant to 42 U.S.C. §1983 arising from the death of Davieon Williams at Elmore Correctional Facility.

## INTRODUCTION

1.     On August 30, 2016, Davieon Williams was murdered at Elmore Correctional Facility.  He was twenty-four (24) years old at the time of his death.

2.     For several years, up to and including the date of Mr. Williams's death, pervasive violence plagued Elmore Correctional Facility.

3.     Around the time of Mr. Williams's death, the Alabama Department of Corrections was experiencing one of the highest prison homicide rates in the nation.

4.     The Alabama Department of Corrections, by its own account, maintained grossly overcrowded and understaffed prisons, including Elmore Correctional Facility at the time of Mr. Williams's death.

5.     Soon after Mr. Williams was killed at Elmore Correctional Facility in 2016, the United States Department of Justice (the "Department of Justice") began an investigation into the Alabama Department of Corrections' persistent failures to provide people incarcerated in Alabama's prisons with adequate protection from prisoner-on-prisoner violence, among other constitutional deficiencies.

6.     In December 2020, the investigation culminated in a lawsuit the Department of Justice filed against the State of Alabama and the Alabama Department of Corrections for their inability to keep people safe from substantial risk of serious harm - including deadly violence - while incarcerated in Alabama's prisons.

7.     The deceased is survived by his two (2) minor children and his grandmother Joann Mitchell, who is the administratrix of his estate.

## JURISDICTION AND VENUE

8.     Jurisdiction is proper pursuant to 28 U.S.C. § 1331, because the claims herein arise under the Constitution, laws, or treaties of the United States.

9.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims presented in this case occurred in Elmore County, Alabama.

## PARTIES

10.    Plaintiff Joann Mitchell is Davieon Williams's grandmother and the administratrix of his estate.   The Plaintiff's deceased grandson, Davieon Williams, was

incarcerated at Elmore Correctional Facility where he was stabbed to death by another prisoner on August 30, 2016. The Plaintiff is over the age of nineteen (19) years old and is a resident of Lafayette, Chambers County, Alabama, which is within the jurisdiction of this Honorable Court.

11.     Defendant Joseph Headley ("Headley" or "Defendant Headley") is a citizen of Alabama and over the age of nineteen (19) years old.

a.     Defendant Headley was the Warden at Elmore Correctional Facility at the time Mr. Williams was stabbed to death and in the months preceding his murder.

b.     Defendant Headley had final responsibility for the day-to-day operations at Elmore Correctional Facility, the safety and security of the prisoners housed in the prison, and the supervision of all subordinate employees working in the prison.

c.     Defendant Headley's responsibilities as Warden also included ensuring adequate supervision and monitoring of prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security.

d.     At the time of Mr. Williams's death, Defendant Headley was on notice of the dangerous, life-threatening conditions at the prison, including the prevalence of violence and deaths, understaffing, and overcrowding. Defendant Headley knew that prisoners housed at Elmore Correctional Facility were subject to a substantial risk of serious harm from violence as described herein, but he deliberately ignored these known risks of serious harm to prisoners.

e.     Finally, Defendant Headley specifically knew of the risk of serious harm

to Davieon Williams, because he knew of the earlier altercation between Jonathan Gladney and Mr. Williams on the same day of Mr. Williams's death.

       f.     Defendant Headley is sued in his individual capacity.

12.     Defendant Jefferson Dunn ("Dunn" or "Defendant Dunn") is a citizen of Alabama and over the age of nineteen (19) years old.

       a.     Defendant Dunn was the Commissioner of the Alabama Department of Corrections ("ADOC") at the time Mr. Williams was killed on or about August 30, 2016, and in the months preceding his murder.

       b.     In April 2015, Defendant Dunn was appointed the Commissioner of the ADOC.[1]  The Commissioner is the highest-ranking official in the ADOC and is responsible for the direction, supervision, and control of the Department of Corrections.

       c.     Defendant Dunn is responsible for exercising the authority, functions, and duties of the Commissioner of the ADOC including the appointment of personnel and employees within the ADOC required for the performance of the ADOC's duties toward the people it incarcerates.  Those duties include operating a prison system that respects the constitutional and human rights of persons within the custody of the ADOC, including the rights belonging to Mr. Williams while he was a prisoner at Elmore Correctional Facility.

       d.     Defendant Dunn acted in a supervisory capacity over the employees of the Elmore Correctional Facility.  Furthermore, the constitutional violations and injuries complained of herein were proximately caused by a pattern and practice of misconduct at Elmore Correctional Facility, which occurred with the consent of Defendant Dunn, who personally knew about, facilitated, approved, or condoned this pattern and practice of misconduct, or at least

---

[1]     There are relevant allegations in this First Amended Complaint that predate Defendant Dunn's tenure as Commissioner of the Alabama Department of Corrections.

recklessly caused the alleged deprivation of rights by his actions or by his deliberate indifference and failure to act.

      e.      Defendant Dunn is sued in his individual capacity.

13.      Defendant Grantt Culliver ("Culliver" or "Defendant Culliver") is a citizen of Alabama and over the age of nineteen (19) years old.

      a.      At the time Mr. Williams was killed at Elmore Correctional Facility, and in the months preceding his murder, Defendant Culliver was the Associate Commissioner of Operations and Institutional Security for the ADOC.  Defendant Culliver first undertook that role in August 2014 and returned to the position in mid-2015 after a demotion in early 2015.

      b.      As Associate Commissioner for Operations and Institutional Security, Defendant Culliver was responsible for ensuring the effective and safe daily operations of the ADOC's correctional facilities housing men, including Elmore Correctional Facility where Mr. Williams was housed in August 2016.

      c.      Defendant Cullliver's responsibilities also included directing and managing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division.

      d.      At the time of Mr. Williams's death, Defendant Culliver was on notice of the dangerous, life-threatening conditions at Elmore Correctional Facility, including the prevalence of violence, understaffing, and overcrowding.  Defendant Culliver knew that prisoners housed at Elmore Correctional Facility were subject to a substantial risk of serious harm from violence as described herein, but he deliberately ignored these known risks of serious harm to prisoners.

e.     Defendant Culliver acted in a supervisory capacity over the employees of the Elmore Correctional Facility.  Furthermore, the constitutional violations and injuries complained of herein were proximately caused by a pattern and practice of misconduct at Elmore Correctional Facility, which occurred with the consent of Defendant Culliver, who personally knew about, facilitated, approved, or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by his actions or by his deliberate indifference and failure to act.

f.     Defendant Culliver is sued in his individual capacity.

14.     Defendant Walter Posey ("Posey" or "Defendant Posey") is a citizen of Alabama and over the age of nineteen (19) years old.

a.     Defendant Posey was assigned to work as a correctional official with supervisory authority over dormitory (A2) in which Mr. Williams was killed on the date of his death and failed to prevent the stabbing.

b.     Defendant Posey was responsible for the safety and security of the people incarcerated at Elmore Correctional Facility and for monitoring and supervising them when working in the prison's dormitories.  Defendant Posey was working in the shift office on the day Mr. Williams was killed and placed Mr. Williams in the dormitory with Jonathan Gladney even though he knew in doing so there was a risk of serious harm to Mr. Williams.

c.     Defendant Posey is sued in his individual capacity.

**STATEMENT OF FACTS**

**I.     OVERCROWDING, UNDERSTAFFING, AND VIOLENCE
       THROUGHOUT ADOC FACILITIES**

15.     The United States Constitution guarantees that all persons within the custody of the ADOC have a right to be housed in safe conditions and not be subjected to violence.

16.     For years, understaffing has been a persistent, systemic problem that leaves many ADOC facilities including Elmore Correctional Facility incredibly dangerous and out of control.

17.     The 2015 calendar year was one of the deadliest in the ADOC's history.  From February 2015 through November 2015, seven (7) people were killed in the Alabama state prison system.

18.     At the end of 2015 Defendant Dunn acknowledged that the ADOC would face violent consequences from prison overcrowding and understaffing.

19.     Between September of 2015 and September 2016, the number of correctional officers assigned to the ADOC's prisons declined twenty percent (20%).

20.     In October of 2016, two (2) months after Mr. Williams was killed, only fifty-three percent (53%) of the correctional officer positions within the ADOC were filled.   ADOC spokesperson Bob Horton gave some historical context to the ADOC's ongoing problems with understaffing: "[t]he Alabama Department of Corrections has a critical shortage of corrections officers...Since 2012, the number of DOC officers has dropped by 20 percent and the rate of violent incidents has increased exponentially."

21.     For its 2016 Fiscal Year,[2] the same year Mr. Williams was murdered at Elmore Correctional Facility, the ADOC reported 1,345 prisoner on prisoner assaults, 636 prisoner on officer assaults, five (5) completed prisoner suicides, and a total of seven (7) people murdered (six (6) prisoners and one (1) correctional officer) throughout the prison system.

22.     In its 2016 Annual Report, the ADOC lists as one of its Department Priorities: "To ensure safe, humane and constitutional conditions of incarceration in all facilities[,]" including Elmore Correctional Facility.

---

[2]     The ADOC's 2016 fiscal year spanned from October 1, 2015 through September 30, 2016, which is inclusive of the date of Mr. Williams's murder on August 30, 2016.

23.     In its 2016 Annual Report, the ADOC also states, in its Department Values: "We value a safe, secure and rehabilitative environment for the inmate population."

24.     Despite these professed values in its own policy statements and prior acknowledgment of forthcoming, violent consequences due to overcrowding and understaffing, violence that had seemingly spiked in 2015, nevertheless continued unabated throughout 2016 in ADOC prisons.

25.     On October 6, 2016, the Department of Justice announced that it had opened a Civil Rights of Institutionalized Persons Act ("CRIPA") investigation into Alabama's male prisons, including Elmore Correctional Facility, less than two (2) months after Mr. Williams was stabbed to death by another prisoner while incarcerated.

26.     In June of 2017, the United States District Court for the Middle District of Alabama found that "ADOC facilities are significantly and chronically overcrowded." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1193 (M.D. Ala. 2017).  The court's findings pertained to, in part, a time period inclusive of the time Mr. Williams was imprisoned at Elmore Correctional Facility.

27.     The court further noted that "[t]he combination of overcrowding and understaffing leads to an increased level of violence, both because of the difficulty of diffusing tension and violence in an overcrowded open-dormitory setting, and because of the lack of supervision by correctional officers." *Braggs*, 257 F. Supp. 3d at 1200.

28.     Defendant Dunn himself, in sworn testimony in the United States District Court for the Middle District of Alabama "aptly described the prison system as wrestling with a 'two-headed monster': overcrowding and understaffing."  *Braggs*, 257 F. Supp. 3d at 1184.

29.     Although Defendants Dunn and Culliver, because of their supervisory responsibilities, were well aware of a history of widespread violence throughout the ADOC's

prisons housing men, the connection between violence and the ADOC's chronic problems with overcrowding and understaffing, neither Defendant Dunn nor Defendant Culliver took meaningful steps, through custom or policy, in 2015 or 2016 to significantly alter the staggering numbers in the ADOC's prisons which continued to show too many prisoners and not enough correctional officers.  Thus, the recipe for violence in ADOC prisons was passed down year after year.

30.    Beginning in 2010 and through the year of his death in 2016, violence in ADOC prisons increased every year, even as the overall prison population steadily declined.

a.    In 2010, there were 418 assaults in Alabama's prisons.

b.    In 2011, there were 849 assaults in Alabama's prisons.

c.    In 2012, there were 875 assaults in Alabama's prisons.

d.    In 2013, there were 967  assaults in Alabama's prisons.

e.    In 2014, there were 1,265 assaults in Alabama's prisons.

f.    In 2015, there were 1,362 assaults in Alabama's prisons.

g.    In 2016, there were 1,764 assaults in Alabama's prisons.

**II.    OVERCROWDING, UNDERSTAFFING, AND VIOLENCE
        AT ELMORE CORRECTIONAL FACILITY**

31.    Elmore Correctional Facility originally was built in 1981 and renovated in 1991. The prison's design capacity is approximately 600 prisoners.  At the time of Mr. Williams's death the prison's census was almost double its design capacity.

32.    Elmore Correctional Facility is a medium custody prison, and at the time of Mr. Williams's death, violent offenders totaled roughly fifty percent (50%) of the prison population.

33.   Prisoners at Elmore Correctional Facility are often double-bunked, the officers' lines of sight inside the dormitories are limited, and this combination can and did lead not only to a higher risk of violent activity, but greater incidences of violence.

34.   The pervasive culture of violence at Elmore Correctional Facility was widely known throughout the ADOC, and known by Defendants Dunn and Culliver, prior to Mr. Williams's murder.

35.   For example, in July 2013, the Equal Justice Initiative complained to the ADOC of widespread physical abuse and other misconduct at Elmore Correctional Facility.

36.   The ADOC began its own investigation in July 2013, into as many as ten (10) incidences of correctional officers using violent force against prisoners at Elmore Correctional Facility.

37.   Later that year, in October 2013, Derrick Denis was stabbed to death by another prisoner at Elmore Correctional Facility.

38.   Eight (8) prisoners were sent to Jackson Hospital in Montgomery, Alabama (three (3) were admitted for treatment) in March 2014, following prisoner on prisoner violence in the course of a riot in one of Elmore Correctional Facility's dormitories.

39.   That same year, Correctional Officer Jeremy Walker assaulted a handcuffed prisoner at Elmore Correctional Facility in July 2014, and pled guilty to his criminal assault in May 2017, in the United States District Court for the Middle District of Alabama.

40.   In November 2014, the Equal Justice Initiative publicly issued findings of "widespread abuse and corruption" in Alabama's prisons.  Correctional officers were reportedly smuggling in contraband items creating a black market that stimulated violence in Alabama's

prisons.  Correctional officers and administrators at Elmore Correctional Facility were alleged to be involved in "prolonged patterns of violence."

41.     By 2015, nearly 400 prisoners were held in each dorm at Elmore Correctional Facility, and bunk beds were being used to detain such a large population in a constricted area.

42.     Leon Forniss, the Warden at Elmore Correctional Facility back in 2015, explained that outfitting dormitories at the prison with bunk beds was unsafe.  The use of bunk beds prevented correctional officers from properly supervising the dormitories because of poor sightlines.  Typically, there were only two (2) correctional officers supervising dormitories housing 392 prisoners.

43.     In addition to the overcrowding and understaffing, the violence at Elmore Correctional Facility perpetuates year after year because its correctional officers continue to lack training and supervision needed to turn the tide of unrelenting violence inside prison walls.

44.     In the month Mr. Williams was murdered, the ADOC reported that its correctional officer staffing rate at Elmore Correctional Facility was a mere 47.3% as the prison was only able to fill eighty (80) of the 169 authorized correctional officer positions.  Meanwhile, the prisoner census at the prison hovered around 195% of capacity.

45.     In August of 2016, in addition to Mr. Williams's death, Elmore Correctional Facility recorded thirteen (13) assaults for a total of seventy-two (72) at the facility eight (8) months into the year.

46.     In an eighteen (18) month window from February 2015 through August 2016, there were three (3) prisoner homicides at Elmore Correctional Facility.[3]

---

[3]     In February 2015, William D. Shepherd was stabbed to death by another prisoner.  In March 2016, Johnny Lee Spears was stabbed to death by another prisoner.  And in August 2016, Mr. Williams was stabbed to death by another prisoner.

47.     Even after these unnecessary and preventable deaths, in September 2016, Elmore Correctional Facility still housed 1,186 prisoners in a facility designed to hold 600 prisoners exceeding design capacity by 198%.[4]

48.     In its 2016 Annual Report, the ADOC revealed the Correctional Officer staffing level for Elmore Correctional Facility, inclusive of the date of Mr. Williams's death, was only 44.4%.

49.     In 2016, Defendant Dunn explained, "The systemic issues throughout the department directly correlate to serious overcrowding, understaffing, and outdated facilities...Elmore Correctional Facility is just one example of what the entire system faces."

50.     At all times material to this action, contraband weaponry was readily available to prisoners at Elmore Correctional Facility, including but not limited to, the contraband weaponry Jonathan Gladney used to stab Mr. Williams to death.

51.     Defendant Dunn had been briefed about overcrowding, correctional understaffing, and ongoing violence and threats of violence toward prisoners and correctional officers at Elmore Correctional Facility in the months leading up to Mr. Williams's death.  Despite his knowledge of substantial risks of serious harm to prisoners at Elmore Correctional Facility, Defendant Dunn failed to act to prevent prisoners at Elmore Correctional Facility, including Mr. Williams, from suffering injury and death.

52.     Defendant Culliver had been briefed about overcrowding, correctional understaffing, and ongoing violence and threats of violence toward prisoners and correctional officers at Elmore Correctional Facility in the months leading up to Mr. Williams's death.

---

[4]     *See, e.g.*, Brian Lyman, *Alabama Corrections Officers' Ranks Drop 20 Percent*, MontgomeryAdvertiser, Jan. 7, 2017, *available at*,
https://www.montgomeryadvertiser.com/story/news/politics/southunionstreet/2017/01/08/alabama-corrections-officers-ranks-drop-20-percent/95762920/.

Despite his knowledge of substantial risks of serious harm to prisoners at Elmore Correctional Facility, Defendant Culliver failed to act to prevent prisoners at Elmore Correctional Facility, including Mr. Williams, from suffering injury and death.

53.     Defendants Dunn and Culliver were aware of the significant, accelerated, and unprecedented decline in correctional officers assigned to ADOC prisons and the substantial risk of violence proximately caused by these conditions within Elmore Correctional Facility and other mens' prisons within the ADOC.

54.     Defendant Headley had direct knowledge of overcrowding, correctional understaffing, and ongoing violence and threats of violence toward prisoners and correctional officers at Elmore Correctional Facility in the months leading up to Mr. Williams's death. Despite his knowledge of substantial risks of serious harm to prisoners at Elmore Correctional Facility, Defendant Headley failed to act to prevent prisoners at Elmore Correctional Facility, including Mr. Williams, from suffering injury and death.

55.     Defendant Headley, on several occasions during his tenure as Warden, returned prisoners to the same housing unit at Elmore Correctional Facility after violent altercations in contravention to national correctional standards, department policy, the prison's accepted procedures, and common sense.

56.     Defendant Headley was aware of other violent incidents occurring in the same housing unit in which Mr. Williams was killed.

57.     Prior to Mr. Williams's death, Defendant Posey was aware of other violent incidents occurring at Elmore Correctional Facility, specifically those involving Dormitory A2 and prior assaults involving Mr. Williams and Jonathan Gladney.

58.     Prior to Mr. Williams's death, Defendants were aware of other violent incidents and drug abuse occurring at Elmore Correctional Facility involving Jonathan Gladney.

59.     Defendants were aware of the volume of drugs, contraband weapons, and violence permeating Elmore Correctional Facility and failed to address how the combination of these factors could result in death, including the death of Mr. Williams.

60.     Defendants Dunn, Culliver, and Headley failed to hold staff accountable at Elmore Correctional Facility for their failures to prevent the flow of contraband weapons and drugs, as well as the ever increasing levels of violence in the prison.

61.     Defendants Dunn, Culliver, and Headley did not draft or implement a corrective action plan at Elmore Correctional Facility to address the significant levels of violence, contraband weapons, and drugs in the prison.

62.     Defendants Dunn, Culliver, and Headley also failed to ensure that working cameras were present in Elmore Correctional Facility to alert correctional officers to violence in the prison so that incidences of violence could be addressed and future occurrences, such as the fatal stabbing of Mr. Williams, could be prevented.

### III.    DAVIEON WILLIAMS'S DEATH AT ELMORE CORRECTIONAL FACILITY

63.     Leading up to and at the time of Mr. Williams' death, Defendants Headley and Posey did not properly classify, assign, or house Mr. Williams and Mr. Gladney in the dormitories at Elmore Correctional Facility.

64.     On the date of his death, Jonathan Gladney and Mr. Williams had been in a fist fight earlier the same day.

65.     Mr. Williams and Jonathan Gladney initially were removed from the dormitory following this earlier fight, but soon thereafter were placed back in the same dormitory together.

66.     After the earlier fight with Jonathan Gladney and shortly before his death, Mr. Williams called his grandmother, Joann Mitchell (the Plaintiff and administratrix of his estate), and told her he feared for his safety at Elmore Correctional Facility and feared retaliation.

67.     Defendant Headley had ordered that he did not want prisoners switching dormitory assignments, but nevertheless, Jonathan Gladney and Mr. Williams were put in the same housing unit despite their earlier altercation that same day and despite the fact that they had been assigned to live in different dormitories.

68.     Accordingly, even after Mr. Williams and Jonathan Gladney had a fight in Dormitory A2 in Elmore Correctional Facility on the morning of August 30, 2016, Defendant Posey improperly returned both of them to Dormitory A2 because he had them sign a living agreement.

69.     Supervisory and correctional staff at Elmore Correctional Facility were aware of Mr. Williams's concerns for his safety, specifically, his fear of retaliation at the hands of Jonathan Gladney, on the day of his death.

70.     Despite this awareness, Defendants Headley and Posey took no action to prevent serious harm befalling Davieon Williams, and thus, he was repeatedly stabbed by fellow prisoner Jonathan Gladney in his dormitory at Elmore Correctional Facility on August 30, 2016.

71.     At the time Jonathan Gladney began stabbing Mr. Williams with contraband weaponry, the dormitory in which both prisoners were housed was grossly understaffed, severely overcrowded, and Defendant Headley had notice of the prison's chronic understaffing of correctional officers and overcrowding of prisoners.

72.     Dormitory A2 at Elmore Correctional Facility, where Mr. Williams was stabbed, had an extensive history of violence due to an insufficient number or complete lack of correctional officers present in the dormitory.

73.     Correctional Officers were not available to prevent the stabbing, to halt the stabbing timely, or to rescue Mr. Williams timely to preserve his life.

74.     At the time Mr. Williams was stabbed to death, there was not a single correctional officer present in Dormitory A2 at Elmore Correctional Facility.

75.     Because there were no correctional officers present in Dormitory A2 at the time Mr. Williams was stabbed, not only did Defendants Headley and Posey fail to prevent Mr. Williams's injuries, but their failure to staff Dormitory A2 prevented him from being transported out of Dormitory A2 in time to access life saving medical care.

76.     As a result of the failure to staff any correctional officers in Dormitory A2 at the time Mr. Williams was stabbed, he was not transported to medical care from the locked and unsupervised housing unit in a timely manner, and instead, his blood began to pool around his body on the floor of Dormitory A2, as his life began to slip away, and he ultimately succumbed to his injuries.

77.     The stab wounds Mr. Williams sustained at Elmore Correctional Facility resulted in his death on August 30, 2016.  He was pronounced dead soon after the stabbing occurred.

78.     Jonathan Gladney was indicted for the murder of Mr. Williams in the Circuit Court of Elmore County, Alabama, Case No.: CC-2017-000776.00.

79.     The Defendants were deliberately indifferent in responding to the known security and safety hazards at Elmore Correctional Facility, even as the level of violence escalated over time.

80.     Furthermore, the Defendants were on notice that the prisoner charged with killing Mr. Williams had a history of assault.  He had been in a physical altercation with Mr. Williams earlier on the same day he killed Mr. Williams.

81.     Instead of taking reasonable precautions to prevent Jonathan Gladney from further harming Mr. Williams and other prisoners, Defendants continued to house him in an area of Elmore Correctional Facility that was significantly overcrowded, grossly understaffed, and into which they housed his eventual victim.

82.     Defendants' actions and inactions proximately caused Mr. Williams's death, in violation of the Eighth Amendment to the United States Constitution.  The Plaintiff seeks damages for Mr. Williams's death due to the deliberate indifference of the Defendants.

83.     Defendants knew that Mr. Williams faced a substantial risk of serious harm in his housing unit at Elmore Correctional Facility both before and especially after his altercation with Jonathan Gladney earlier in the day on August 30, 2016.

84.     Nevertheless, Defendants disregarded known risks to Mr. Williams's security and safety by housing him in an understaffed, overcrowded, and unsafe dormitory at Elmore Correctional Facility in which contraband weaponry was readily available.

85.     Defendants failed to take reasonable measures to guarantee the safety of Mr. Williams.

**CAUSE OF ACTION**

**<u>COUNT ONE</u>**
Violation of Eighth and Fourteenth Amendments to the United States Constitution
and 42 U.S.C. § 1983
(Against All Defendants)

86.     The Plaintiff adopts and incorporates by reference each and every allegation contained in the preceding paragraphs of this First Amended Complaint as if fully set forth

herein.

87.     Defendants' policies, practices, acts, and omissions placed Davieon Williams at unreasonable and foreseeable risk of serious injury and death.

88.     The Eighth Amendment imposes a duty of prison officials to protect prisoners from violence at the hands of other prisoners.

89.     Defendants had at least the following duties:

        a.      To see that measures were in place to reasonably ensure prisoners' safety, including the safety of Davieon Williams; and

        b.      To attend to such measures and reasonably ensure prisoners' safety, including the safety of Davieon Williams.

90.     Defendants breached these duties and were deliberately indifferent to Mr. Williams's needs in at least the following manner:

        a.      Failing to protect Mr. Williams from serious risk of death at the hands of a foreseeable assailant;

        b.      Failing to heed specific warnings regarding the risk of serious injury or death to Mr. Williams at the hands of a foreseeable assailant;

        c.      Failing to adequately watch or supervise the housing unit where Mr. Williams was located;

        d.      Failing to act quickly when the fight started to prevent injury to Mr. Williams;

        e.      Failing to intervene and prevent Mr. Williams's death;

        f.      Failing to remove contraband weaponry from Mr. Williams's housing unit; and

g.     Failing to have policies and procedures in place, and/or by failing to adequately supervise or train employees in accordance with said policies and procedures, and/or by failing to attend to such policies and procedures so as to ensure the safety of prisoners such as Mr. Williams.

91.    Defendants acted with deliberate indifference to the safety of Mr. Williams while he was incarcerated at Elmore Correctional Facility.  As a consequence, Mr. Williams was incarcerated under conditions posing a substantial risk of serious harm and which ultimately caused his death.

92.    Defendants' policies, practices, acts, and omissions constituted deliberate indifference to a serious risk of harm to Mr. Williams and constitute clearly-established violations of the Cruel and Unusual Punishments Clause of the Eighth Amendment, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

93.    As a proximate result of Defendants' illegal and unconstitutional acts and omissions, Mr. Williams was left unprotected; was attacked; experienced grave physical, emotional, and psychological injury and pain; and died.

94.    The Defendants' above-described actions were deliberate and in reckless disregard of the constitutional rights of Mr. Williams.  Defendants' conduct warrants an award of punitive damages in an amount to be determined at trial.  Punitive damages are necessary to deter future Eighth Amendment violations by these Defendants and at Elmore Correctional Facility.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully prays for the following relief:

(a)     Assume jurisdiction over this action;

(b)      Grant the Plaintiff a trial by a struck jury;

(c)      Declare that the acts and omissions described herein violated Davieon Williams's rights under the Constitution and laws of the United States;

(d)      Enter judgment in favor of the Plaintiff and against each Defendant for all damages allowed by law;

(e)      Award the Plaintiff prejudgment and postjudgment interest at the highest rates allowed by law;

(f)      Award the Plaintiff the costs of this lawsuit and reasonable attorneys' and expert fees and expenses pursuant to 42 U.S.C. § 1988(b) & (c) and as otherwise allowed by law; and

(g)      Order such other and further relief as this Honorable Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by a struck jury.

Dated: February 25, 2021

Respectfully submitted,

**/s/ Anil A. Mujumdar**
Anil A. Mujumdar (ASB-2004-L65M)
*One of the Attorneys for the Plaintiff*

**/s/ Gregory M. Zarzaur**
Gregory Zarzaur (ASB-0759-E45Z)
*One of the Attorneys for the Plaintiff*

**OF COUNSEL:**
DAGNEY JOHNSON LAW GROUP
2170 Highland Avenue
Suite 250
Birmingham, Alabama  35205
T: 205.590.6986
F: 205.809.7899
E: anil@dagneylaw.com

Denise Wiginton (ASB-5905-D27W)
THE ZARZAUR LAW FIRM
2332 2nd Avenue North
Birmingham, Alabama 35203
T: 205.983.7985
F: 888.505.0523
E: gregory@zarzaur.com / denise@zarzaur.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the 25th day of February 2021, a copy of the foregoing

document was served on all counsel of record via the Court's CM/ECF system.

Benjamin Albritton
ALABAMA ATTORNEY GENERAL'S OFFICE
501 Washington Avenue
Montgomery, AL 36130
T: 334.353.4484
E: balbritton@ago.state.al.us
*Attorney for the Defendants*

/s/ Gregory Zarzaur
OF COUNSEL